IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| LARRY L. SALMONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 11-4259-CV-C-REL-SSA |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Larry Salmons seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in discounting the opinions of Pascha Boyd, R.N., consulting psychiatrist Dr. Thomas Spencer, and treating psychiatrist Dr. Sarmistha Bhalla. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I. BACKGROUND

On January 26, 2007, plaintiff applied for disability benefits alleging that he had been disabled since October 1, 2000, amended to February 1, 2008.[1] Plaintiff's disability stems from bipolar disorder and obsessive compulsive disorder. Plaintiff's application was denied on May 25, 2007. On April 29, 2009, a hearing was held before an Administrative Law Judge. On August 20, 2009, the ALJ found that plaintiff was not under a "disability" as defined in the Act. The Appeals Council granted plaintiff's request for review and remanded the case for

---

[1]Plaintiff first amended his alleged onset date to February 1, 2008 (Tr. at 69). Then during the second administrative hearing, plaintiff amended his alleged onset date to August 25, 2008 -- the date after which alleges that he did not use illegal drugs or alcohol (Tr. at 33-35).

another hearing.[2]  On October 28, 2010, the second hearing was held, and on December 16, 2010, the ALJ found plaintiff not disabled.  On July 28, 2011, the Appeals Council denied plaintiff's request for review.  Therefore, the December 16, 2010, decision of the ALJ stands as the final decision of the Commissioner.

## II.     STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

---

[2]The appeals council noted that the first ALJ found that plaintiff could perform work at all exertional levels but was limited to simple work.  The ALJ found that plaintiff could return to his past relevant work as a CNA; however, that work is semi-skilled with a level four specific vocational preparation time which exceeds the limitation to "simple" work (Tr. at 103).  Additionally, the first ALJ found that "outside the realm of substance abuse" plaintiff had mild difficulties in social function and activities of daily living and moderate difficulties in concentration, persistence and pace.  However, the ALJ did not adequately develop the substance abuse issue, instead merely implying that substance abuse may cause greater limitations on plaintiff's mental functioning (Tr. at 104).

2

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

III.     BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform.  Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

       Yes = not disabled.
       No = go to next step.

Case 2:11-cv-04259-REL   Document 19   Filed 02/11/13   Page 3 of 45

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.    THE RECORD

The record consists of the testimony of plaintiff and vocational expert Gary Weimholt, in addition to documentary evidence admitted at the hearing.

### A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

| Year | Earnings | Year | Earnings |
|------|---------|------|---------|
| 1978 | $ 0.00 | 1994 | $ 10,746.22 |
| 1979 | 0.00 | 1995 | 5,037.14 |
| 1980 | 0.00 | 1996 | 5,370.67 |
| 1981 | 0.00 | 1997 | 1,090.71 |
| 1982 | 0.00 | 1998 | 0.00 |
| 1983 | 0.00 | 1999 | 6,123.03 |
| 1984 | 0.00 | 2000 | 5,241.41 |
| 1985 | 378.78 | 2001 | 0.00 |
| 1986 | 5,897.23 | 2002 | 1,763.78 |
| 1987 | 6,800.95 | 2003 | 16,453.85 |
| 1988 | 6,753.04 | 2004 | 15,875.39 |
| 1989 | 9,819.53 | 2005 | 21,386.76 |

4

| | | | |
|---|---|---|---|
| 1990 | 8,898.39 | 2006 | 13,527.79 |
| 1991 | 7,906.45 | 2007 | 4,232.33 |
| 1992 | 10,064.31 | 2008 | 1,956.85 |
| 1993 | 11,980.59 | 2009 | 0.00 |

(Tr. at 208-209, 218).

**Function Report Adult - Third Party**

On March 24, 2007, plaintiff's live-in girl friend, Connie Lato, completed a Function Report Adult - Third Party in which she reported that plaintiff has no problems with personal care; he gets upset when watching football on TV if the game is not going well; and his impairments do not affect his ability to sit, use his hands, understand, concentrate, follow instructions, or remember (Tr. at 260-269).

**B.  *SUMMARY OF TESTIMONY ON OCTOBER 28, 2010***

During the October 28, 2010, hearing, plaintiff testified; and Gary Weimholt, a vocational expert, testified at the request of the ALJ.

**1.  Plaintiff's testimony.**

At the time of the hearing, plaintiff was almost 42 years of age and is currently 44 (Tr. at 37).  He was 5'6" tall and weighed 250 pounds (Tr. at 37).  Plaintiff weighed about 340 pounds and lost weight in 2006 or 2007 (Tr. at 37).  Plaintiff is single but has one 20-year-old child (Tr. at 38).  Plaintiff lives in a house with his fiancée (Tr. at 38).  She pays the rent or mortgage -- she works as a supervisor of housekeeping (Tr. at 38).

Plaintiff does not have a valid driver's license (Tr. at 38).  It was revoked around 1990 for DWI (Tr. at 38-39).  Plaintiff has a GED (Tr. at 39).  He was in the United States Marine Corps from 1987 to 1991; however, he went AWOL in 1988, was incarcerated, and then was dishonorably discharged (Tr. at 39).

5

Plaintiff has not worked since August 2008 (Tr. at 39-40). Plaintiff had Medicaid, but he was dropped, he reapplied, and he was denied because he was not disabled (Tr. at 40). Plaintiff had food stamps for a short time while he was on Medicaid (Tr. at 40-41).

Plaintiff's last job was at Jefferson Lodge where he worked as a certified nurse's assistant (Tr. at 41). He took care of mentally impaired people at a residential care facility (Tr. at 41). He took their vitals, gave them baths, helped them get to bed, served their food, did their laundry (Tr. at 41). He lifted over 100 pounds in that position (Tr. at 41). That job ended because he "got in trouble" for possessing cocaine and becoming incarcerated (Tr. at 41-42). Plaintiff went from one CNA job to another because he moved around looking for a place to settle down (Tr. at 42). In 2002 he had a job laying carpet -- he left that job for a different job (Tr. at 43). Plaintiff did not work in 2001 because he was serving a 28-month prison sentence for DWI (Tr. at 43-44). Plaintiff's job at American Precast involved pouring concrete -- that job ended when he was incarcerated for DWI (Tr. at 44). Plaintiff had no job in 1998 because he was serving a 19-month prison sentence for DWI (Tr. at 45). In 1997 he worked for Barnett Robertson washing trucks (Tr. at 45). He left that job for another job (Tr. at 45). Plaintiff also worked as a cashier (Tr. at 46-47). Plaintiff cannot perform any of these jobs full time anymore because of his chronic obstructive pulmonary disease -- he gets coughing spells, he gets dizzy and sometimes nauseated and he passes out; he also urinates and defecates on himself (Tr. at 47). He also cannot lift what he used to, he cannot walk and stay on his feet for a long time, and he gets shorts of breath (Tr. at 47).

The ALJ asked plaintiff if he could do a full-time job where his duties included only sitting all day looking at monitors, and alerting someone by phone if he saw trouble (Tr. at 47-48). Plaintiff said, "I might be able to do that job. I might be able to, yeah." (Tr. at 48).

Case 2:11-cv-04259-REL   Document 19   Filed 02/11/13   Page 6 of 45

Plaintiff last used alcohol around 2000 (Tr. at 48). Plaintiff started using marijuana when he was 13 (Tr. at 48-49). He last used it "probably around 2000" (Tr. at 49). He started using cocaine when he was 19 or 20 (Tr. at 49). He last used that August 25, 2008 (Tr. at 49).

Plaintiff is currently receiving mental health treatment from Options (Tr. at 49). He is anxious and depressed, he does not get along well with people, he gets stressed out easily, little things make him agitated (Tr. at 49-50). Plaintiff's counsel asked, "Now, when the judge asked you the question about doing that monitor job and you said that you might be able to do it, were you -- were you thinking about the problems you just described?" (Tr. at 50). Plaintiff said, "Yeah. Well, a lot of it depends on if I'm around people" (Tr. at 50). His attorney asked him to think about the symptoms he described and think about the job, and then asked him again about performing that job (Tr. at 50). Plaintiff said, "[Y]eah -- if it was -- if I was sitting there by myself, probably so." (Tr. at 50).

Plaintiff was asked if there are days he spends in bed -- he said he does (Tr. at 50). When asked why, plaintiff said, "Because I don't have nothing to do" (Tr. at 50). He is depressed when he stays in bed all day, and this occurs about five days per week (Tr. at 50-51). Plaintiff gets side-tracked and loses concentration when he is having a conversation with someone (Tr. at 51). Plaintiff does not read or watch television because those things do not interest him (Tr. at 51). He does, however, watch football on television because he is interested in it (Tr. at 54). He was asked whether he has trouble talking on the phone, and plaintiff said, "It depends on how long the conversation is" (Tr. at 52-53).

Plaintiff described his obsessive-compulsive disorder as follows: "I like the house -- I like it picked up but I don't wanna do it. I'll expect everybody else to do that and then I'm always on them for not picking up the house and keeping the house clean." (Tr. at 52). When asked to give an example of how he has trouble staying on subject, plaintiff said, "Well, when I

get on a -- something might happen and I might get on something and I'll just stay on that subject until there -- I might tell somebody to do something and I just -- keep on harping at 'em until they do it." (Tr. at 52).

At night and during the day, plaintiff gets up "every hour on the hour" (Tr. at 53). Every now and then he does the dishes or takes out the trash (Tr. at 53). When asked if he has any activities outside the house, he said he did not: "I don't get out. I just -- I don't have a driver's license and I don't get out and my fiancée works during the day and I have no transportation" (Tr. at 53). When asked what he enjoys doing, he said he likes to mess with cars (Tr. at 54). When asked why he does not do that much anymore, plaintiff said, "I don't have a car to mess with" (Tr. at 54).

2.    Vocational expert testimony.

Vocational expert Gary Weimholt testified at the request of the Administrative Law Judge. The first hypothetical involved a person limited to light work but who could not climb ladders, ropes or scaffolds; could only occasionally kneel; could not crawl; must avoid concentrated exposure to extreme cold, extreme heat, fumes, odors, dusts, gases, and working in poorly ventilated areas; must do work that is simple, routine, and includes repetitive tasks and may only have occasional decision-making and only occasional changes in the work setting; the person must avoid all interaction with the public and is to have only occasional interaction with co-workers; and no tandem tasks can be assigned to co-workers throughout the day (Tr. at 58). The vocational expert testified that such a person could work as an evening cleaner of office buildings, with 8,000 in the state and 400,00 in the country; an assembler of small electrical accessories or other electronic work, with 2,500 in the state and 125,000 in the country; or an inspector or hand packager, with 2,500 in the state and 125,000 in the country (Tr. at 59-60). The cleaning job would not involve any more fumes

than those present in cleaning agents used to clean one's home (Tr. at 62).

The second hypothetical was the same as the first except the person could have no interaction with co-workers other than casual and infrequent contact (Tr. at 60). The vocational expert testified that such a person could still do the same jobs as those described in the first hypothetical (Tr. at 60).

The third hypothetical was the same as the second except the person could only have occasional judgment required (Tr. at 60). The same jobs would be available (Tr. at 60).

The fourth hypothetical was the same as the third except the person could have no changes in the work setting (Tr. at 60). The vocational expert testified that there are no such jobs (Tr. at 60-61).

More than 1 1/2 to 2 days off work in the first several months of employment usually results in the person's termination (Tr. at 61).

A person having the limitations described by Nurse Boyd would not be able to work (Tr. at 63). A person having the limitations described by Dr. Bhalla would not be able to work (Tr. at 64).

## C. SUMMARY OF PLAINTIFF'S TESTIMONY ON APRIL 29, 2009

During the April 29, 2009, hearing, plaintiff testified that he and his fiancée had been together for six years (Tr. at 70). Her three children also live in the home with them (Tr. at 71).

Plaintiff has been to prison three times -- he had two felony convictions for DWI and one conviction for possessing cocaine (Tr. at 73). At the time of the hearing, plaintiff was on five years' probation after a 120-day shock incarceration for the cocaine conviction (Tr. at 74). Because in Missouri a condition of probation is employment, the ALJ asked plaintiff what his probation officer had said about his not working (Tr. at 74). Plaintiff said his probation officer

was waiting to see what happens with plaintiff's disability application (Tr. at 74). When asked what his fiancée thinks about his not working, plaintiff said, "She says you either try to get disability or get a job." (Tr. at 74).

Plaintiff last used cocaine in February of 2008 (Tr. at 75). Plaintiff got caught because his fiancée called the police on him because she was upset that he was using drugs (Tr. at 76). Plaintiff smokes a pack of cigarettes per day (Tr. at 76).

Plaintiff was seeing Ms. Boyd for psychiatric care about once every three months (Tr. at 77-78). Plaintiff's symptoms include depression, anxiety, sometimes he feels like doing nothing, he has paranoid tendencies, and he does not like working around people (Tr. at 78). When plaintiff gets anxious, he gets sweaty and has an adrenaline rush and "that's about it" (Tr. at 79). Plaintiff gets depressed and wants to keep to himself and sleep a lot, and this happens about twice a week (Tr. at 79).

When asked to described his obsessive-compulsive disorder, plaintiff said, "I like my house clean. I don't want -- I don't like the children to get into anything. I don't like them to, you know, to mess up anything. It was -- it's specifically got to do with my house, you know, I just -- I'm obsessed about just -- I don't -- I don't -- I don't -- the kids. I don't like them messing up anything." (Tr. at 80). Plaintiff said he gets along with the kids (Tr. at 80).

Plaintiff has no difficulty talking on the phone or answering the door if someone comes by (Tr. at 80). He has difficulty with short-term memory because sometimes he "forgets his hygiene" (Tr. at 80). Plaintiff's medications make him drowsy (Tr. at 81).

Plaintiff has type 2 diabetes, but because he did not have insurance at the time of the hearing, he was not taking any medication for it (Tr. at 81). He last saw a doctor for his diabetes a year or so ago (Tr. at 81).

Case 2:11-cv-04259-REL   Document 19   Filed 02/11/13   Page 10 of 45

Hot and cold weather cause plaintiff to cough and sometimes he gets dizzy and passes out (Tr. at 82).

On a typical day, plaintiff will pick up the house a little bit, vacuum, make the bed (Tr. at 81). He usually takes a nap during that day because he feels tired (Tr. at 81).

D. **SUMMARY OF MEDICAL RECORDS**

On May 19, 2004, plaintiff went to Mid Missouri Mental Health Center with complaints of feeling depressed (Tr. at 325-326).

> The patient used to see Dr. Hall, but had not seen him since September 2003. One month ago he relapsed and his symptoms of depression returned. He was evaluated by Dr. Kurian and he was given a prescription for Wellbutrin [treats depression] and was told to follow up on an outpatient basis. He was waiting for a ride to go home, but his friend never showed up. Later that evening, his friend called and insisted that he get admitted to the hospital. During the interview the patient was calm, cooperative and articulate, but very vague. He stated that he spent 2 1/2 years in jail for DWIs. He was released 18 months ago, but was still on parole. He had been using drugs and alcohol since the age of 13. He used "downers", marijuana, crack/cocaine, methamphetamine and LSD. He had two 30 days ADA treatments in Mexico, MO and he had a Department of Corrections treatment for a total of two years. He had been clean and sober for 17 months, but relapsed one month ago. He had used marijuana 3-4 times, cocaine once and alcohol several times. He started feeling anxious, paranoid and depressed. . . .

Plaintiff was given Vistaril for insomnia and anxiety and he was started on Wellbutrin for depression and Ambien for insomnia. His symptoms improved (sleep became adequate and depression decreased) and he reported no side effects from his medication. He was social and interacted with others; he attended group therapy. "Towards the end of the hospitalization, he reported that he had been able to evaluate his current situation and he saw that he had not been trusting the people around him. He stated that he could now trust what others were telling him and he felt like he was ready for discharge." Plaintiff was discharged from the hospital on May 24, 2004. On discharge, he was alert and oriented, his mood was "fine", his affect was congruent. His speech was of normal rate and rhythm. He denied auditory or

11

visual hallucinations. His diagnosis was polysubstance dependence in partial remission and substance induced mood disorder.

On July 12, 2004, plaintiff saw John Hall, M.D., complaining of paranoid thoughts (Tr. at 352). Dr. Hall observed that plaintiff's mood was depressed, but he had good eye contact, and he had a goal-directed flow of thought. He was prescribed Lexapro [treats anxiety and depression], Zyprexa [treats schizophrenia and bipolar disorder] and Clonazepam [treats anxiety].

On August 2, 2004, plaintiff saw Dr. Hall and indicated he was doing a lot better (Tr. at 353). His sleep was OK, he was more mellow and not as hyper. Dr. Hall observed that plaintiff had good eye contact, goal directed flow of thought, and his mood was better. He continued his on Lexapro, Zyprexa, and Clonazepam.

On October 4, 2004, plaintiff saw Dr. Hall and said he was doing better, he was sleeping OK, he was not too depressed and he was not having flashbacks (Tr. at 354). Dr. Hall observed that plaintiff had good eye contact, goal-directed flow of thought, OK mood, and normal affect. He continued him on his same medications but decreased his Zyprexa.

On December 3, 2004, plaintiff saw Dr. Hall and reported that "work is good," he was sleeping all night, he was not too depressed, and he was having no flashbacks (Tr. at 355). Dr. Hall observed that plaintiff had good eye contact, goal-directed flow of thought, good mood, normal affect. He continued plaintiff on the same medications.

On February 4, 2005, plaintiff saw Dr. Hall and reported that work was going very well, he was sleeping well, the world was treating him OK, he was having no flashbacks (Tr. at 356). His only concern was weight gain. He was observed to have good eye contacted, goal directed flow of thought, good mood, normal affect. He was continued on his same medications but his dose of Zyprexa was reduced. He was told to return in two months.

On Saturday afternoon, April 23, 2005, plaintiff went to the emergency room at Capital Region Medical Center complaining of a fall "Saturday night" (Tr. at 330-335). He was taking Lexapro and Zyprexa. Plaintiff complained that he was short of breath all the time and he passed out due to a coughing spell. He was smoking two packs of cigarettes per day. His pain was rated a 2-3 on a scale of 1-10. X-rays and an EKG were done; both were normal. He was alert and oriented times three, he had no abnormality of mood or affect, his memory was good, but he was anxious. His physical exam was essentially normal except on exam of his lungs the doctor heard rales and wheezes. The diagnoses are illegible.

On August 8, 2005, plaintiff returned to see Dr. Hall after a six-month break in treatment (Tr. at 357). He was "really moody and irritable." He complained of being more claustrophobic. "Ready to go back to work tomorrow!" He reported feeling less anxious. Dr. Hall observed good eye contact, goal-directed flow of thought, good mood, normal affect. He continued plaintiff on his same medications and told him to return in six weeks.

On September 29, 2005, plaintiff saw Dr. Hall and said his "mood is great" he was back to work with no problems, he had a positive attitude, he was not anxious, he was sleeping OK (Tr. at 358). His mental exam was normal, and he was continued on his same medications.

On November 3, 2005, plaintiff saw Dr. Hall and indicated that work was going well, sleep and mood were OK, he was not anxious (Tr. at 359). "Larry feels things are going very well." His mental exam was normal, he was continued on his same medications, and he was told to return in two months.

On January 12, 2006, plaintiff saw Dr. Hall and reported that Christmas went "great," his sleep was good, his mood had been good, work was good (Tr. at 362). He complained of gaining weight due to Zyprexa. His mental exam was normal, he was continued on his same medications but his dose of Zyprexa was reduced. He was told to return in two months.

On March 16, 2006, plaintiff saw Dr. Hall (Tr. at 363). He reported that things were "Good!", work was fine, sleep was alright. His mental exam was normal. Dr. Hall decided to take him off Zyprexa due to weight gain. He continued him on the rest of his medications and provided him with samples. Plaintiff was to return in two months.

On November 28, 2006, plaintiff was seen in the emergency room at University of Missouri Health Care for swelling of his right foot, ankle and leg which he reported had been present for the past two years (Tr. at 338-347). He was on no medication at the time, and he was smoking two packs of cigarettes per day. He was alert and oriented times three, his mood and affect were normal. His physical exam was essentially normal except wheezes were heard on exam of his lungs, he had edema in his leg, and he was obese. Plaintiff's blood work was normal except his glucose was high at 189 (normal is 100 or below). X-rays and a bilateral lower extremity ultrasound were normal. He was assessed with pedal edema,[3] chronic obstructive pulmonary disease ("COPD"),[4] mild hypertension and obesity. He was prescribed Hydrochlorothiazide for hypertension, Albuterol for COPD. "You have multiple health problem[s] that will need to be addressed by a primary care doctor. Please make an appt for next week to continue evaluation and treatment. You should also discuss smoking cessation

───────────────

[3]The accumulation of excess fluids in the lower extremities.

[4]Chronic obstructive pulmonary disease (COPD) is one of the most common lung diseases. It makes it difficult to breathe. There are two main forms of COPD: chronic bronchitis and emphysema. The best test for COPD is a lung function test called spirometry. This involves blowing out as hard as possible into a small machine that tests lung capacity. The results can be checked right away, and the test does not involve exercising, drawing blood, or exposure to radiation. Using a stethoscope to listen to the lungs can also be helpful. However, sometimes the lungs sound normal even when COPD is present. Pictures of the lungs (such as x-rays and CT scans) can be helpful, but sometimes look normal even when a person has COPD (especially chest x-ray). Sometimes patients need to have a blood test (called arterial blood gas) to measure the amounts of oxygen and carbon dioxide in the blood. "Persons with COPD MUST stop smoking. This is the best way to slow down the lung damage." http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001153/

14

and weight loss."

On December 13, 2006, plaintiff was seen in Dr. Hall's office (Tr. at 360-361). He had been off his medications for five months and had not seen Dr. Hall for the past nine months. He reported feeling anxious and depressed for the past three months. Plaintiff was unemployed. Plaintiff said he was seen in the emergency room for flashbacks about three days earlier and was put back on his medications. "Beginning to feel somewhat better." Most of the record is illegible; however, it is clear a discussion was had about plaintiff's use of marijuana, cocaine and methamphetamine. He continued to smoke. He was assessed with obsessive-compulsive disorder, post traumatic stress disorder, and depression not otherwise specified.[5] He was told to restart Abilify[6] and Lexapro and return in six weeks.

On January 25, 2007, plaintiff saw Uzma Zafar, M.D., a psychiatrist at Arthur Center (Tr. at 364-365). He complained of frustration over not having his driver's license, which was revoked for three years because of multiple DWIs.

> He said that he stays home all day with his girlfriend and cannot drive or go out, which is interfering with his efforts to find a job. He is no longer having the flashbacks that he presented with when I saw him initially on 12/13/06. He's not ruminating about the past either (sexual abuse by his brother at age 4). He said that his mood has gotten better, but he continues to have problems with sleep, hourly awakenings and inability to go right back. He is denying any new changes with his energy or concentration, but baseline he has reported that his concentration hasn't been great. He denies any problems with his appetite. He denies thoughts of harm to self or others or any ab normal perceptions. He is a former patient of Dr. Hall. He had been off his medications for approximately five months when I saw him on his initial visit and restarted the abovementioned medications. Patient has had issues with drugs in the past and has been clean for six months now.

---

[5] A more general category of depressive disorders that do not fit the descriptions of major depressive disorder or dysthymic disorder.

[6] Treats bipolar disorder and schizophrenia, but is also used as an "add on" for depression treatment.

15

Plaintiff reported smoking a pack of cigarettes per day. He was observed to be dressed in a t-shirt and pajamas with poor grooming and hygiene and a disheveled appearance. He made fair eye contact, his speech was spontaneous and coherent. Thought form was linear and goal directed. Thought content was devoid of any delusions, phobias or obsessions. He denied thoughts of harm to himself or others or any abnormal perceptions. His mood was described as frustrated. His affect was broad and reaction, insight and judgment were fair. He was assessed with post-traumatic stress disorder, resolved; depression not otherwise specified; and obsessive-compulsive disorder by history. He was told to continue Abilify and Lexapro (but at a higher dose) and Dr. Zafar added Trazodone [antidepressant] and provided samples. She told plaintiff to return in two months.

On March 5, 2007, plaintiff was seen at the Arthur Center (Tr. at 370-371). He said he felt alright, his medications were working OK except with sleep. He was dealing with life and having no flashbacks. "Doesn't have driver's license, will not get it for another three years due to multiple DWIs. . . . Needs to exercise". Plaintiff reported using no alcohol or drugs; he was smoking one pack of cigarettes per day. Plaintiff's mental status exam was normal. He was assessed with obsessive-compulsive disorder by history and post-traumatic stress disorder, resolved. He was continued on his same medications and told to return in two months.

On May 7, 2007, plaintiff saw Dr. Zafar at the Arthur Center for a three-month follow up (Tr. at 372-373). He was taking Abilify and Lexapro.

He said that he got his Medicaid two weeks ago and he's still waiting on disability. He's in a relationship. He stays at home while his girlfriend works. He does not have a license. It was revoked three years because of multiple DWIs. . . . This interferes with his efforts to go out and find a job. He denies any flashbacks or any nightmares. He's not ruminating about the past sexual abuse by his brother at age 4, either. His mood has gotten better. He said situationally he gets depressed and anxious, but is able to think rationally and get over those states without much difficulty. He is sleeping better on the Trazodone. He denies any significant problems with energy or concentration. He has gained weight and he said that he realizes that he needs to exercise more and

16

eat healthy. He said he did not have a primary-care physician for the longest time, but now that he has Medicaid he's going to look for one.

Plaintiff said he had not used drugs for nearly a year and had been compliant with his medications. He was still smoking a pack of cigarettes per day.

MENTAL STATUS EXAMINATION: This is a 38-year-old, moderately obese, white male, who presents for follow-up appointment, dressed casually in a navy blue t-shirt and shorts. . . . He spoke in a loud voice, which was goal directed and coherent. H[is] content of thought was mainly the frustration he's experiencing about not having a license and the inability to find a job. He denied thoughts of harm to self or others or any abnormal perceptions. Mood was described as "okay for the most part." Affect was congruent with mood. Insight and judgment - fair.

Plaintiff was assessed with post-traumatic stress disorder, resolved; obsessive-compulsive disorder, by history, in remission; and mood disorder not otherwise specified. He was continued on Lexapro, Abilify and Trazodone.

On May 24, 2007, Michael Stacy, Ph.D., completed a Psychiatric Review Technique finding that plaintiff's mental impairment is not severe (Tr. at 374-386). His limitations were mild. In support of these findings, Dr. Stacy noted that plaintiff shows treatment for post-traumatic stress disorder and depression with Dr. Hall whose records show that when plaintiff is on medication, his condition is controlled. Plaintiff's symptoms in 2006 were the result of his being off his medication for five months. Once he was restarted on his medication, his symptoms subsided. His frustrations came from his lack of a driver's license and inability to find a job, not from mental conditions. Plaintiff did not return paperwork describing his activities of daily living. His condition has responded well to medication, and his history suggests that so long as he continues treatment, his condition would not severely limit him from performing work-related activities.

On May 30, 2007, plaintiff saw Kenneth Lawlor, D.O., complaining of a cough for the past three years (Tr. at 448-451). He reported coughing day and night and sometimes passing

17

out or throwing up from coughing. Plaintiff also complained of shortness of breath all the time. Plaintiff reported that he has bipolar disorder and obsessive compulsive disorder. "Currently he is not working and he is trying to apply for disability. He does smoke about two packs a day for the last ten years and prior to that he smoked between one and two packs for 20 years. Alcohol: He drinks occasionally. Drugs: Has not used any drugs for the last seven years but before that, he frequently used marijuana, meth and cocaine." Plaintiff was taking Abilify, Lexapro and Trazodone. Plaintiff was observed to be morbidly obese with occasional coughing. His psychiatric exam was normal. Dr. Lawlor recommended pulmonary function tests and sleep study. "I have encouraged patient to cut back on his smoking and try to cut back from two packs a day to one pack a day and then we will work him down from there." Plaintiff was told to come back after her got the recommended tests done.

On August 13, 2007, plaintiff saw Dr. Zafar for a follow up (Tr. at 570). "He said that he has dropped the idea of going on disability and he's trying to lose weight. He's lost 10 pounds already. He's a CNA by profession and he's starting applying to nursing homes. He's hoping to get a job very soon. He denies any mood symptoms. Sleep is mostly good, but at times requires Trazodone. He said that he was medication compliant. He denies any nightmares, any flashbacks or any obsessive-compulsive disorder-like symptoms. . . . Overall he's been doing very well. . . . He seems to have maintained mood stability since last seen." Plaintiff denied abnormal perceptions, he said his mood was OK. Insight and judgment were fair. He was assessed with post-traumatic stress disorder, resolved; obsessive-compulsive disorder, by history, in remission; mood disorder not otherwise specified. He was told to continue his medications.

On November 16, 2007, plaintiff reported to Dr. Zafar that the state dropped his Medicaid because he has a job (Tr. at 572-573). He said his mood was fine, his sleep was

good, he had no mood symptoms. His behavior was observed to be cooperative, his mood and affect were good. He was assessed with mood disorder not otherwise specified, OCD in remission, PTSD in remission. He was continued on his same medications.

On January 16, 2008, plaintiff saw Warren Cooper, M.D., complaining of cough and shortness of breath on exertion (Tr. at 387-402, 406-420, 445-446, 453-456). Plaintiff reported frequent episodes of passing out from coughing and being sleepy during the day. Plaintiff had a resting pulse ox[7] of 85%. With ambulation, his pulse ox decreased to 80%. Dr. Cooper noted that plaintiff had pulmonary function tests done six months earlier which showed moderate restrictive disease, but plaintiff did not follow up. Plaintiff had also been scheduled for a sleep study to confirm diagnosis of obstructive sleep apnea, but he failed to show up for that test. Plaintiff denied current use of drugs or alcohol, but he continued to smoke two packs of cigarettes per day (Tr. at 445). He had smoked for 23 years (Tr. at 446). "Currently he is applying for disability due to his resp[iratory] status. Smokes 1-2 ppd [packs per day] for past 25 years; H/O ETOH [history of alcohol] abuse, but denies current use; Drug: Has not used any drugs for the last seven years but before that, he frequently used marijuana, meth and cocaine." Plaintiff was morbidly obese, he had an occasional cough. He had decreased air movement in his lungs, but no crackles or wheezes. Plaintiff was alert and oriented times four with a normal mood. Plaintiff was assessed with exacerbation of chronic bronchitis/chronic obstructive pulmonary disease. He was given medications, pulmonary function tests were scheduled, and was counseled on smoking cession and given nicotine patches. He was set up for an outpatient sleep study. Due to his low pulse ox, he was admitted

_____

[7]Informally called "pulse ox" because a pulse oximeter is used to measure oxygen saturation in the blood. Oxygen saturation rate is the fraction of the hemoglobin molecules in a blood sample that are saturated with oxygen at a given partial pressure of oxygen. Normal saturation is 95%-100%.

19

to the hospital.

On January 18, 2008, plaintiff was discharged from the hospital (Tr. at 395-397). While a patient, he was given Solu-Medrol[8] and Levaquin [treats bronchitis and pneumonia] and Albuterol/Atrovent treatments "and this all seemed to help him tremendously. He responded well to these therapies". Plaintiff's fasting glucose was 368 (should be 100 or below) and his A1c[9] was 10.3. Cholesterol was elevated at 263 and LDL was 127. Plaintiff was started on Metformin (treats diabetes). "[I]t was also decided to start him on ASA, Advair, and Albuterol while here in preparation for his discharge. He tolerated all of these medications well." Plaintiff's chest x-rays were within normal limits but notable for signs of chronic obstructive pulmonary disease. Plaintiff was discharged with medications for breathing and diabetes, and he was given oxygen and told to follow up with his primary doctor. Plaintiff's pulmonary function tests were scheduled for January 22, 2008, and he was told to have a sleep study and a cardiac stress test.

On January 23, 2008, plaintiff saw Venkata Kadipireddy, M.D., for a follow up after his hospitalization (Tr. at 442-443). Plaintiff reported that since beginning to use oxygen and the medications prescribed at the hospital, "he feels much better and is less short of breath. His cough is greatly improved and he doesn't have any chest pain or wheezing. He denies

---

[8]Generically, methylprednisolone, Solu-Medrol is one of a group of corticosteroids (cortisone-like medications) that are used to relieve inflammation in different parts of the body.

[9]Once glucose sticks to a hemoglobin protein, it stays there for the lifespan of the hemoglobin protein, or for about 120 days. Therefore at any given moment, the glucose attached to hemoglobin A protein reflects the level of blood sugar over two to three months.

For a person without diabetes, a typical A1c level is about 5%. If the patient has diabetes, it is recommended, by the American Association of Clinical Endocrinologists, that a level of 6.5% or below should be the target goal. The American Diabetes Association suggests a goal of 7% or lower.

Case 2:11-cv-04259-REL   Document 19   Filed 02/11/13   Page 20 of 45

palpitations or pedal edema." Plaintiff had not increased his dosage of Metformin as directed. With regard to his high cholesterol, plaintiff was not on any medication but said he was watching his diet and had lost nine pounds since his hospital visit. Plaintiff's physical exam was normal. He had no wheezing or abnormal breath sounds, and his oxygen saturation was 96% on room air. He had no pedal edema. Plaintiff's Metformin dose was increased "along with dietary changes. He was counseled regarding diet and exercise." His other medications were continued, and Dr. Kadipireddy recommended plaintiff have pulmonary function tests and a sleep study.

February 1, 2008, is plaintiff's amended alleged onset date.

On February 18, 2008, plaintiff was seen by Dr. Zafar (Tr. at 574-575). He was working at Jefferson Lodge at a nurse's aide. "He said he came out of the hospital [for COPD] in early February and has been out of his psychiatric medications since then. He's trying to cut back on his smoking and now is down to one pack a day. . . . He said that mood wise he's been doing well. . . . He's been counseled on nutrition and exercise. He's not exercising, but plans to watch his diet now. He denies any flashbacks or nightmares. He believes that the post-traumatic stress disorder and depression are under control." Plaintiff's mental status exam was normal. He was assessed with PTSD resolved, OCD in remission, and mood disorder not otherwise specified. He was continued on his same medications except his Trazodone dose was increased at plaintiff's request for aid in sleeping. "Encouraged to cut back on his nicotine".

On March 21, 2008, plaintiff saw Dr. Kadipireddy for a follow up on COPD and diabetes (Tr. at 438-441). Plaintiff reported that during the past few days he was more short of breath both at rest and on exertion. He was also getting up in the middle of the night with coughing. "He applied for medicaid and [is] hoping that insurance would be kicking in [in] a few days." "Can't afford accucheck [to test glucose level]. On metformin 1000 mg BID.

Smoker 2 to 3 packs per day -- trying to cut down." (Tr. at 441). Regarding his diabetes, "[p]atient reports that he is compliant with his medication and also watching his diet." Plaintiff was taking Lexapro, Abilify, Trazodone, Metformin, Aspirin, Albuterol, Advair, and he was using oxygen at night. Plaintiff's exam was normal (including his psychiatric exam) except he had inadequate air movement and wheezing bilaterally. Plaintiff had a breathing treatment at the clinic and was breathing better. Dr. Kadipireddy started him on Spiriva and told him he needs to have pulmonary function tests done. "Also counseled about smoking cessation and information provided about public health department sponsored smoking quitting program in Columbia."

On April 9, 2008, plaintiff saw Peter Koopman, M.D., for a follow up on COPD and diabetes (Tr. at 434-437). Plaintiff said he had Medicaid so he could now afford his medication and tests. "He reports that his cough is worse after he smokes". Plaintiff denied shortness of breath at rest or on exertion. He denied wheezing. "He reports that he cut down from smoking two packs per day to one pack per day and is trying to reduce this further. He was also diagnosed with diabetes mellitus Type 2 and currently is on Metformin 1000 mg BID [twice a day], but he reports that he ran out of his prescription five days ago and since then he has not taken this medication. He is checking his blood sugars regularly and reports that it is usually 240 and above fasting. He also complains of increased polyuria,[10] stating that he gets up in the middle of the night every hour to pee". Plaintiff had gained six pounds since his last visit "which he attributes to lack of exercise and irregular eating habits. He is supposed to be on an 1800 calorie diabetic diet, but he says that he is not really following the diet." Plaintiff's physical exam was normal. Dr. Koopman expressed the importance of quitting smoking. "It

---

[10]Excessive secretion of urine.

does not appear that the patient is 100% compliant with his medications and his blood sugars are not well controlled. . . .  Patient was counseled on the importance of weight reduction and smoking cessation as well as the importance of being compliant with his medications."

On April 30, 2008, plaintiff had a sleep study done (Tr. at 403-405, 452).  He was diagnosed with "very severe obstructive sleep apnea".  Howard Goldberg, M.D., recommended that plaintiff lose weigh "to within 10% of ideal weight", avoid sedatives at bedtime, and use a CPAP machine (for obstructive sleep apnea) while sleeping.

On May 19, 2008, plaintiff saw Dr. Zafar for a follow up (Tr. at 576-577).  "He's very frustrated that his Medicaid got turned down yet again.  He's not working at Jefferson Lodge anymore.  He said that his physical problems interfere with his ability to sustain any job. . . . He denies any affective symptoms, except extreme frustration about his Medicaid/disability. He's not exercising, but is just watching his diet. . . .  He plans to meet his doctor today and will also discuss Medicaid issues with him.  He continues to be worried about his physical health, but mental health-wise he states that there are no issues to discuss."  Plaintiff's mental status exam was normal.  His assessments were the same, his medication was continued.

That same day, plaintiff was seen by Dr. Kadipireddy for a follow up on chronic medical problems (Tr. at 431-433).  Plaintiff was taking Metformin for his diabetes and reported his blood sugar was running between 140 and 220.  Plaintiff said he was following a 2,000 calorie per day diabetic diet "but is not exercising much and he continues to smoke one pack of cigarettes per day."  Plaintiff was also taking Lipitor for high cholesterol.  He denied any side effects from his medication.  Plaintiff reported good control of his COPD symptoms with his medication.  Plaintiff said he was told after a sleep study that he has mild sleep apnea and he should be on a CPAP.  Plaintiffs' blood pressure was normal, his lungs were clear to auscultation bilaterally, and the rest of his physical exam was normal as well.  He was assessed

23

with diabetes, COPD, high cholesterol, and sleep apnea. Dr. Kadipireddy added Glyburide for diabetes, took blood for an A1c test, told plaintiff to get on a CPAP, and continued his other medications.

On June 27, 2008, plaintiff saw Dr. Kadipireddy for a follow up on diabetes (Tr. at 428-430). Plaintiff's sugar had been around 160 most of the time, he denied any hypoglycemic episodes, and he denied any side effects from his medication. "He reports since starting the Spiriva he doesn't wake up in the middle of the night with coughing. He is breathing much better overall". Plaintiff's blood pressure was normal, his lungs were clear to auscultation bilaterally. His chronic obstructive pulmonary disease was listed as stable. He was told to continue on his diabetes medications.

On August 11, 2008, plaintiff saw Pascha Boyd, a nurse at Arthur Center (Tr. at 578-579). Plaintiff reported that he had been stable and was there for a medication follow up. Plaintiff said his post-traumatic stress disorder was relatively well-controlled. Plaintiff told Ms. Boyd he had not used drugs for the past three years. After performing a mental status exam, Ms. Boyd wrote, "Individual is alert and oriented, cooperative. His mood is stable and his affect is bright. He states he can have some mild anxiety. Current issues of being out of work and his health are stressful to him, but he states he's coping effectively. He denies any suicidal or homicidal ideation and denies psychosis, although there is a strong history of psychosis. He denies any other concerns. Average intellectual functioning. Insight and judgment seem fair. Mental status is otherwise unremarkable." She diagnosed post traumatic stress disorder, by history, resolved; obsessive-compulsive disorder, in remission; mood disorder not otherwise specified; rule out schizoaffective disorder;[11] "please note a strong history of psychosis";

---

[11]A "rule out" diagnosis is an exclusion that reduces the number of possible diagnoses under investigation. Schizoaffective disorder is a mental condition that causes both a loss of

24

multiple medical issues, including obesity, type 2 diabetes, and chronic obstructive pulmonary disease.  Plaintiff's medications were refilled.

On August 26, 2008, plaintiff saw a Nurse at the commencement of a term of incarcerated in the Missouri Department of Corrections after a conviction for possession of cocaine (Tr. at 482-487, 547-548).  Plaintiff reported smoking a pack of cigarettes per day.  He was asked whether he has a chronic cough, and he answered, "no".  When asked if he has any medical problems they needed to know about, plaintiff responded, "Yes, I have a swollen testicle."  Plaintiff said he had not been in the Missouri Department of Corrections before; however, there are medical records from the Missouri Department of Corrections dated 1997 through 2002 (Tr. at 459-482).  Plaintiff's blood sugar measured 128 (should be below 100), his cholesterol was 269 (should be below 200), his triglycerides were 860 (should be 150 or below).  His A1c was 7.6 (should be 4 to 6).  Plaintiff reported that "he has struggled most with etoh [alcohol] abuse but that recently he was using cocaine daily.  His current charge is for possession".  Plaintiff's insight and judgment were average.  His thought processes were organized, reality based, and free from delusional content.

On September 2, 2008, plaintiff saw a psychiatrist with the Missouri DOC (Tr. at 548-549).  Plaintiff had not taken his Zyprexa, Lexapro and Abilify "for more than two weeks now."  Plaintiff reported that Zyprexa increased his weight from 170 to more than 300 pounds in one year.  "He considers alcoholism as his main problem having previously come to prison on charges of DWI.  He claims that [he] stopped drinking because of his problems with alcohol but switched to using cocaine which led to his present imprisonment.  He minimized or denies any history of other substance abuse."  Plaintiff's mental exam was normal except that he

---

contact with reality (psychosis) and mood problems.

sweated profusely and appeared anxious over "issues that he left behind because of his imprisonment." He was assessed with mood disorder not otherwise specified, by history; dysthymic disorder;[12] anxiety disorder; alcohol dependence; cocaine abuse; obesity; COPD; and diabetes. He was prescribed Prozac (antidepressant) and Vistaril (treats anxiety).

On October 6, 2008, plaintiff failed to show up for a medical appointment at his place of incarceration (Tr. at 550).

On October 17, 2008, plaintiff had a medical appointment while incarcerated (Tr. at 550-551). "He was pleasant in his presentations." He reported fluctuating moods, bouts of anger, anxiety, and obsessive-compulsive characteristics which he said were "more prevalent at home." Plaintiff was observed to have a stable mood, appropriate affect, average or above average grooming, eye contact and cooperation. His speech and motor activities were within normal limits. His thought processes were organized, reality based and without delusional content. Insight and judgment were adequate. "No significant signs or symptoms of mental illness on this day."

On October 20, 2008, plaintiff saw a psychiatrist while incarcerated (Tr. at 551-552). Regarding plaintiff's Prozac and Vistaril treatment, "He reports that he [is] doing quite well on the medications. He is looking forward to finishing his treatment and going home. He claims that he has previously been able to abstain from alcohol use after having been in prison in the past for alcoholism but is now on a charge of cocaine use. He is also a smoker and has COPD." The doctor performed an exam. "On examination Mr. Salmons was extremely friendly. . . . He complained of restlessness and anxiety but indicated that the current medications have helped him. He has been compliant with the treatment. He had no side effects from either

---

[12]Dysthymic disorder is a chronic type of depression in which a person's moods are regularly low. However, symptoms are not as severe as with major depression.

26

medication. . . .  He is also aware of the fact that his own addiction to smoking and eating have a lot to do with his medical problems as well as legal problems.  He was encouraged to participate in a treatment program but was also advised to look at his own attitude and try to improve his outlook and willingness to make changes in his approach to dealing with his immediate needs.  He was easy to redirect.  He did not demonstrate any anger or aggressiveness.  He also denied feelings of hopelessness and thoughts of suicide."  He was continued on his same medications.

On December 8, 2008, plaintiff had a medical appointment while in custody (Tr. at 552-554).  Plaintiff claimed his right arm was bothering him and he claimed he had fallen from Heaven.  He said he was very afraid of being in prison and he wanted to go back and live with his girl friend.  Plaintiff was oriented and although he was sweating, the medical assessor indicated that he was uncertain about the genuineness of plaintiff's alleged delusions.  His eye contact and speech were within normal limits.  He was placed on "close observation to determine the degree and legitimacy of delusions."

The following day (December 9, 2008), plaintiff indicated that he felt better (Tr. at 554-555).  When asked what was going on the day before, plaintiff indicated that he thought he was the devil because of things that had been said to him when he was a child.  He asked to be taken off close observation status, but then "He asks one of the custody officers 'Who am I?'.  He is oriented x4."  Plaintiff was kept on close observation status.

On December 10, 2008, plaintiff had a medical appointment while incarcerated (Tr. at 555-556).  When he was asked how he was doing, he said "about the same" and said he wanted to go home.  Plaintiff denied hallucinations.  He said he thought he was in danger but was unable to say why.  He said he was confused.  Plaintiff was hopeful he would get out of prison before Christmas.  He was anxious about not being able to communicate with his

27

fiancée and daughter.

On December 11, 2008, plaintiff reported that he was ready to return to general population (Tr. at 557). He denied hallucinations and delusions. His mood was stable, his affect was appropriate. Voice, eye contact and motor were all within normal limits. Thought processes were logical, well organized and goal directed. Plaintiff was taken off close observation status and returned to his prior custody status. Later that day, he was seen after he had been moved into general population. "Ct. said he will be discharged soon. He will return to live with his girlfriend in Fulton. He will also enroll in AA and NA and apply for disability."

On December 15, 2008, plaintiff was again seen in crisis care after talking about the devil (Tr. at 558). Plaintiff's release date was scheduled as December 24, 2008. It was noted that last week when plaintiff began his delusional thinking, his girl friend called the prison and reported that he cycles through similar thinking "this time of year." Plaintiff said he was not suicidal and had come up with his own coping strategy when his thinking becomes skewed: "He'll remember that he has faulty thinking due to his abuse. He will say, 'That was then, this is now. I will keep my mind peaceful. I can't change the past. I am not responsible for the world.' Ct. said he will also apply for disability when discharged." Plaintiff was "most adamant" that he did not need to be sent on observation watch.

On December 17, 2008, plaintiff reported that Prozac and Vistaril were "really helping" his depression and anxiety and "that's all I need now" (Tr. at 559). He reported no side effects from his medication. He was observed to be friendly, polite, and easy to redirect. He had no anger, agitation, thoughts of violence or suicide.

On December 23, 2008, plaintiff's prison records indicate that plaintiff's fiancée had reported that plaintiff "goes through seasonal cycling of his moods and at times has to be hospitalized for medication adjustments." (Tr. at 560). Plaintiff stated that he planned to live

28

with his fiancée upon his release and "he will apply for disability compensation."

On January 29, 2009, plaintiff saw Pascha Boyd, a nurse at the Arthur Center, for medication follow up (Tr. at 580-581). "He reports that since I saw him last he was incarcerated. He states that he received a possession charge in February of that year. He states he eventually was sent to prison. He states he wasn't honest with me when he met with me last. He states he still had occasionally been using cocaine, but it wasn't as bad as it had been." Plaintiff said he did had a history of psychosis "even absent of substance abuse, but states it did make all of his problems worse." Plaintiff claimed he was irritable on Prozac and Vistaril. "He denies any current substance abuse." Plaintiff was on parole at the time. "It should be noted that he does have high cholesterol and diabetes, but he reports that those are relatively managed." Under mental status exam, Nurse Boyd recorded plaintiff's reports of his symptoms in addition to noting that he was alert and oriented, cooperative, had average intellectual functioning, fair to good insight and judgment. Ms. Boyd discontinued plaintiff's Lexapro and Vistaril, increased his Prozac, and continued his Abilify and provided samples.

On February 16, 2009, Ms. Boyd completed a Medical Report for the Missouri Department of Social Services stating that plaintiff has a history of psychosis, depression, anxiety, trauma, some substance abuse history "but clean 3 years & still struggles w/mental health issues. At times his behavior has been grossly effected by delusions." (Tr. at 583-584). Someone scratched through this page and wrote, "Did not assess these elements." On the second page, Ms. Boyd wrote that plaintiff's primary diagnosis was mood disorder not otherwise specified, suspect schizoaffective disorder, obsessive compulsive disorder. She wrote, "Patient has not functioned at a high and consistent level in home or occupational settings." Again, someone scratched through this page and wrote, "Did not assess these elements."

On April 7, 2009, Ms. Boyd completed a Medical Assessment of Ability to do Work-Related Activities (Mental) (Tr. at 586-587). She noted that plaintiff had a good to fair ability to follow work rules. With respect to the rest of the listed abilities, Ms. Boyd checked "fair" to "poor or none" on all of them: relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with work stresses, function independently, and maintain attention/concentration. In support she wrote, "Patient has severe obsessive compulsive tendencies that would interfere with work that is not very formal and regimented. Additionally he is easily overwhelmed and generally paranoid of others. At times he's been extremely psychotic and lost touch with reality versus his delusions." She found that plaintiff had no ability to understand, remember and carry out complex job instructions; a "fair to no" ability to understand, remember and carry out detailed but not complex job instructions; and a fair ability to understand, remember and carry out simple job instructions. She wrote, "Meds intensify poor memory issues but high and severe anxiety issues make focus and organization extreme challenges for this patient." She found that plaintiff had no ability to maintain personal appearance, to behave in an emotionally stable manner, to relate predictably in social situations, or to demonstrate reliability. She wrote, "When he is sick this would all be very very poor [illegible] does has [sic] some moments of improved functioning but has not been able to maintain thos [sic]." Ms. Boyd indicated that plaintiff "can" manage his own benefits.

On June 28, 2009, Thomas Spencer, Psy. D., completed a psychological evaluation "to assist in the determination fo eligibility for Social Security disability benefits" (Tr. at 592-596). Plaintiff alleged bipolar disorder and obsessive compulsive disorder. Plaintiff said he was complaint with his medication, that he experiences more lows than highs, that his symptoms are "fairly controlled" with medication but that he still experiences symptoms. Plaintiff claimed to be "up" and energetic for a couple days and then "down" for a few days during

30

which he sleeps for 20 hours per day. Plaintiff claimed that he "eats less" when he is depressed. He said his concentration and attention are poor and that "most of the time" he is irritable. He reported constant mood swings -- sometimes he is on an adrenaline high and feels elated and euphoric. He claimed to feel anxious and nervous when around people and as a result he stays home all the time. He said when he leaves home, he has panic attacks. Plaintiff admitted that during all of his reported paranoid and delusional periods, he was "drinking and drugging at the time." Plaintiff continued to smoke a pack of cigarettes a day, down from "upwards of three packs a day." Plaintiff attends church on a regular basis. He described his illegal drug use and denied any involvement in Alcoholics Anonymous or Narcotics Anonymous. He said he has four prior felony convictions, was placed on probation six months earlier and is on probation for the next five years. Plaintiff said he gets the kids up and off to school, and he tries to keep the housework up.

Dr. Spencer observed that plaintiff's grooming and hygiene were normal. Eye contact was fair, he was cooperative and appeared to be a "decent historian." Insight and judgment were relatively intact. He was alert and oriented times four, he had no delusions or hallucinations, he was not suicidal or homicidal, he "did not present as paranoid, suspicious, hypervigilant, or grandiose." Flow of thought was intact and relevant. He demonstrated no impairment in long-term memory and could do simple math.

Although plaintiff claimed to be disabled due to bipolar disorder and obsessive-compulsive disorder, "Mr. Salmons did not endorse symptoms completely consistent with bipolar disorder when seen today." With regard to plaintiff's alleged psychosis, he wrote, "he stated he has not heard voices in several years and it certainly appears the psychosis and paranoia could be secondary to his drug and alcohol use."

31

That same day, Dr. Spencer completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) (Tr. at 589-591). He found that plaintiff had mild restrictions in his ability to understand, remember and carry out simple instructions. He found plaintiff had moderate restrictions in his ability to understand, remember and carry out complex instructions and in his ability to make judgments on simple work-related decisions. He found that plaintiff had marked restriction in his ability to make judgments on complex work-related decisions. He was asked to "identify the factors (e.g., the particular medical signs, laboratory findings, or other factors described above) that support your assessment." He wrote, "**Mr. Salmons reported** continued impaired [illegible]/conc[entration] even though he remains compliant w/meds." (emphasis added). Dr. Spencer found that plaintiff's ability to interact appropriately with the public, supervisors, and coworkers was moderately impaired, and that his ability to respond appropriately to usual work situations and changes in a routine work setting was moderately to markedly impaired. Again he was asked to identify the factors supporting those findings, and Dr. Spencer wrote, "**Mr. Salmons reported** continued [illegible]." (emphasis added). He concluded the form, with, "History of meth, cocaine, ETOH, LSD, and pot although claimed no use in at least a year." When asked if plaintiff could manage benefits in his own interest, Dr. Spencer checked "no".

On April 13, 2010, plaintiff saw Sarmistha Bhalla, M.D., at the Arthur Center (Tr. at 597). Plaintiff reported that he is still irritable and is not sleeping comfortably but could not get a sleep study done because he could not pay for it. Plaintiff denied symptoms of depression, mania, hypomania, and suicidal ideation. He was alert and oriented, pleasant, cooperative. His eye contact was good, his appearance was appropriate. His mood was euthymic, his flow of thought was normal and logical. His thought content was normal. He had no hallucinations. He was assessed with bipolar disorder not otherwise specified. He was advised

32

to lose weight and use Prozac.

On June 22, 2010, plaintiff saw Dr. Bhalla (Tr. at 598). He reported being a little agitated because his disability hearing was coming up and he is stressed about getting denied. He was sleeping and eating OK; he denied symptoms of depression, mania, psychosis, and suicidal ideation. He was alert, his eye contact was good, his appearance was appropriate, he was irritable. His thought flow was normal and logical, his thought content was normal, he had no hallucinations, his memory was intact, his insight was fair, his judgment was fair. He was assessed with bipolar disorder not otherwise specified and was told to use Abilify.

On August 30, 2010, plaintiff saw Dr. Bhalla (Tr. at 599). He reported continued anxiety about his disability hearing that was scheduled for October. He was not sleeping well at night and requested Trazodone. He denied symptoms of depression, mania, psychosis. "No other issues." His entire mental status exam was normal, as in the previous records. He was assessed with bipolar disorder not otherwise specified and was prescribed Trazodone as requested.

On September 27, 2010, Dr. Bhalla completed a Medical Assessment of Ability to do Work-Related Activities (Mental) (Tr. at 600-601). She found that plaintiff had a fair ability to follow work rules, but had no ability to relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with work stresses, function independently, or maintain attention and concentration. When asked to list the medical/clinical findings that support the assessment, Dr. Bhalla left that section blank. Dr. Bhalla found that plaintiff had no ability to understand, remember and carry out even simple job instructions. Again, when asked for support, Dr. Bhalla left that part of the form blank. Dr. Bhalla found that plaintiff had a fair ability to behave in an emotionally stable manner and to demonstrate reliability, but he had no ability to maintain personal appearance or relate predictably in social situations.

33

And again, the section asking for support for those findings was left blank. Amazingly, Dr. Bhalla found that plaintiff could manage his benefits in his own best interest, even though in just over a month she would report that plaintiff's mental illness prevented him from being able to take his own medication regularly.

On November 8, 2010, Dr. Bhalla wrote a letter to whom it may concern stated that plaintiff had been a patient of hers since September 2009 -- even though there are no records from Dr. Bhalla predating April 13, 2010. Dr. Bhalla indicated that plaintiff was being treated for bipolar disorder. "He has been taking his medication regularly, but due to his mental illness he might be missing a few days a month and could have difficulty maintaining a reliable work attendance."

## V.     FINDINGS OF THE ALJ

Administrative Law Judge Bradley Hanan entered his opinion on December 16, 2010 (Tr. at 8-21). He found that plaintiff's last insured date is March 13, 2013 (Tr. at 8, 10).

Step one. Plaintiff has not worked since his amended alleged onset date (Tr. at 10).

Step two. Plaintiff has the following severe impairments: bipolar disorder, morbid obesity, chronic obstructive pulmonary disease, obstructive sleep apnea, and diabetes mellitus (Tr. at 10).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 11).

Step four. Plaintiff's subjective allegations of disabling symptoms are not credible (Tr. at 13-14). Plaintiff retains the residual functional capacity to perform light work except that he cannot climb ropes, ladders or scaffolds; he cannot crawl; he can occasionally kneel; he should avoid concentrated exposure to extreme cold, extreme heat, and irritants such as fumes, odors, dusts, gases, and working in poorly ventilated areas; he is limited to work that involves only simple, routine, and repetitive tasks in a low stress job defined as having only occasional

34

decision-making required and only occasional changes in work settings; and he is to have no interaction with the public and only casual and infrequent contact with co-workers (Tr. at 12). With this residual functional capacity, plaintiff cannot return to his past relevant work (psychiatric aide, nurse's aide, assembler, cleaner, and cashier) (Tr. at 19).

Step five. Plaintiff can perform other work available in significant numbers in the national and regional economy, such as office cleaner, assembler of small products, or inspector/hand packager (Tr. at 20).

## VI.  OPINIONS OF TREATING MEDICAL PROFESSIONS

Plaintiff argues that the ALJ erred in forming his own opinion based on the medical evidence instead of relying on the opinion of a treating source, i.e., Nurse Pascha Boyd, Dr. Thomas Spencer (who was a consulting doctor), and Dr. Sarmistha Bhalla. Plaintiff's argument is wholly without merit.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give the opinion: (1) the length of the treatment relationship, (2) frequency of examinations, (3) nature and extent of the treatment relationship, (4) supportability by medical signs and laboratory findings, (5) consistency of the opinion with the record as a whole, and (6) specialization of the doctor. 20 C.F.R. § 404.1527(d)(2) - (5).

## A.  THOMAS SPENCER, PSY.D.

The ALJ had this to say about Dr. Spencer:

The claimant underwent a post hearing consultative examination with Thomas J. Spencer, Psy.D., on June 12, 2009. After interviewing the claimant, he diagnosed the claimant with mood disorder, not otherwise specified, polysubstance dependence (in sustained remission), post traumatic stress disorder (by history), obsessive-compulsive disorder (by history). The claimant's Global Assessment of Functioning score was 50-53. The claimant did not endorse symptoms completely consistent with bipolar disorder when seen. The psychosis and paranoia could be secondary to his drug and alcohol use.

Dr. Spencer opined that the claimant was functioning with "marked" ratings (serious limitation with substantial loss in the ability to effectively function) for making judgments on complex work-related decisions. The claimant had "moderate" ratings (defined as slight limitation, but can still function satisfactorily) for making judgments on simple work related decisions and understanding, remembering, and carrying out complex instructions. The claimant had "mild" ratings (slight limitation but can generally function well) for understanding, remembering and carrying out simple instructions. The claimant had a "moderate to marked" rating for responding appropriately to usual work situations and to changes in a routine work setting. The claimant had "moderate" ratings for interacting appropriately with the public, supervisors and co-workers. Dr. Spencer's description of the claimant's ability to work is generally consistent with his observations of the claimant, and deserves significant weight; however, the GAF score is not. The GAF score suggests that the claimant would be more limited, which is inconsistent with Dr. Spencer's objective findings, and for that reason, the GAF score cannot be given significant weight.

(Tr. at 16-17).

Because the ALJ specifically stated that he gave significant weight to all of Dr. Spencer's opinion except his GAF score, that is the only finding at issue in this argument. The Eighth Circuit has held that an ALJ must rely on the doctor's opinion if supported by the medical records and reject the GAF if that score is inconsistent with the rest of the opinion. Halverson v. Astrue, 600 F.3d 922, 931 (8th Cir. 2010). In this case, the ALJ found that Dr. Spencer's opinion was consistent with his examination of plaintiff, but the single Global Assessment of Functioning was not consistent with the rest of the opinion and therefore he did not give weight to the GAF score. This was in accordance with the law and was not error.

B.    SARMISTHA BHALLA, M.D.

The ALJ had this to say about Dr. Bhalla's opinion:

36

The record contains some reports from the claimant's treating psychiatrist, Sarmistha Bhalla, M.D. When she examined the claimant in her office, she typically observed him to have little or no symptoms; however, when she prepared her reports, she described the claimant as having serious symptoms that would prevent him from doing any kind of work on a full-time basis. Her assessment is not consistent with her objective observations and for that reason cannot be given significant weight. It is also relevant to note that she indicates that she has had a treating relationship with the claimant since September 2009; however, her treatment notes begin on April 13, 2010. This additional inconsistency also tends to erode her credibility.

(Tr. at 18-19).

The records establish that plaintiff saw Dr. Bhalla three times before she completed the

Medical Assessment form at issue.

1.      On April 13, 2010, plaintiff reported that he was still irritable and was not sleeping comfortably but could not get a sleep study done because he could not pay for it. He denied symptoms of depression, mania, hypomania, and suicidal ideation. He was alert and oriented, pleasant, cooperative. His eye contact was good, his appearance was appropriate. His mood was euthymic, his flow of thought was normal and logical. His thought content was normal. He had no hallucinations.

2.      On June 22, 2010, plaintiff reported being a little agitated because his disability hearing was coming up and he was stressed about getting denied. He was sleeping and eating OK; he denied symptoms of depression, mania, psychosis, and suicidal ideation. He was alert, his eye contact was good, his appearance was appropriate, he was irritable. His thought flow was normal and logical, his thought content was normal, he had no hallucinations, his memory was intact, his insight was fair, his judgment was fair.

3.      On August 30, 2010, plaintiff reported continued anxiety about his disability hearing that was scheduled for October. He was not sleeping well at night and requested Trazodone which he was given. He denied symptoms of depression, mania, psychosis. "No other issues." His entire mental status exam was normal, as in the previous records.

That is the extent of Dr. Bhalla's observations and findings; it is the full extent of her

treatment relationship with plaintiff. There is no plausible argument that these records

support Dr. Bhalla's finding that plaintiff had no ability to relate to co-workers; deal with the

public; use judgment; interact with supervisors; deal with work stresses; function

independently; maintain attention and concentration; understand, remember and carry out

even simple job instructions; maintain personal appearance; or relate predictably in social

37

situations. Plaintiff complained of nothing but an inability to sleep comfortably -- which he related to his sleep apnea, not to any mental condition -- and anxiety over his upcoming disability hearing. No other symptoms were alleged. No other symptoms were observed. No other symptoms were diagnosed. No other symptoms were treated. There is absolutely no support for any of the findings in Dr. Bhalla's Medical Assessment form. Additionally, the ALJ pointed out that Dr. Bhalla reported a longer treatment relationship with plaintiff than her records showed, indicating that she either exaggerated her findings for plaintiff's benefit or failed to review her own records before completing the form. And the ALJ noted that Dr. Bhalla found that plaintiff has essentially no mental ability to do much of anything at all, including maintaining attention and concentration or functioning independently, and she wrote in her letter that plaintiff's mental condition prevented him from even being able to take his own medication regularly; however, she believed that plaintiff was capable of handling his own money. The ALJ properly found this an extremely inconsistent finding.

With respect to the factors listed in 20 C.F.R. § 404.1527(d)(2) - (5), Dr. Bhalla's treatment relationship was related to his alleged mental impairment and she is a specialist, but the frequency of examinations was that she saw plaintiff on only three occasions, her opinion is not supported by medical signs and laboratory findings, her opinion is not supported by her own medical records, and her opinion is not supported by the record as a whole. Therefore, the ALJ did not err in failing to give it any weight.

## C.   *NURSE BOYD*

The ALJ had this to say about Pascha Boyd, RN:

On January 29, 2009, the claimant again saw Nurse Boyd. The claimant had since been incarcerated, received a drug possession charge . . . and was sent to prison. The claimant stated he has not been honest with her. He still had occasionally been using cocaine. He admitted he had a history of psychosis but substance abuse made all of his problems worse. On a mental status examination, the claimant was alert and oriented

38

and cooperative. He had some ongoing irritability and depression. He denied any suicidal or homicidal ideation and denied psychosis. He had average intellectual functioning. His insight and judgment seemed fair to good. His mental status was otherwise unremarkable. He was diagnosed with posttraumatic stress disorder, by history, resolved, obsessive compulsive disorder in remission, and mood disorder, not otherwise specified, rule out schizoaffective disorder.

(Tr. at 15).

On February 16, 2009, Nurse Boyd completed a Medical Report Including Physician's Certification/Disability Evaluation indicating that the claimant had some substance abuse history but reportedly was clean for 3 years and struggled with his mental health. The claimant was assessed with mood disorder, not otherwise specified, post traumatic stress disorder, and obsessive-compulsive disorder.

(Tr. at 15).

On April 7, 2009, Nurse Boyd, completed a Mental Medical Assessment of Ability to Do Work-Related Activities, in which she found the claimant had severe obsessive compulsive tendencies that would interfere with work that is not very formal and regimented. Additionally, he was easily overwhelmed and generally paranoid of others. At times, he has been extremely psychotic and lost touch with reality versus delusions.

The ALJ listed all of the specific findings of Nurse Boyd, such as plaintiff's "poor or no ability" to relate to co-workers; deal with the public; use judgment; interact with supervisors; function independently; deal with work stresses; maintain attention and concentration; understand, remember and carry out detailed and complex job instructions; maintain personal appearance; relate predictably in social situations; behave in an emotionally stable manner; and demonstrate reliability.

In spite of these ratings, Nurse Boyd found the claimant could manage benefits in his own best interest, which is inconsistent with her assessment, and casts doubt on her credibility.

In summary, records from Nurse Boyd indicate that the claimant reported he has been stable. The claimant was alert, oriented and cooperative on his mental status examination. His mood was stable and his affect was bright. He has some mild anxiety and his current issues of being out of work and his health were stressful to him but he was coping effectively. He denied any suicidal or homicidal ideation and denied psychosis, although there was a strong history of psychosis. He denied any other concerns. The claimant had average intellectual functioning. His insight and judgment seemed fair. His mental status was otherwise unremarkable. On January 29, 2009, the

claimant advised Nurse Boyd that he had not been honest with her and had been using cocaine. The fact that the claimant lied to Nurse Boyd about his use of illegal drugs tends to erode his credibility. Because the claimant lacks credibility, any RFC that relies on his subjective description of his limitations would not be valid and deserves little weight. Another reason little weight is given to Nurse Boyd's assessment of the claimant is because her own observations are inconsistent with her assessment, and tend to show the claimant to be less limited. There is no credible evidence of extreme deterioration in functioning from the time Dr. Zafar found Global Assessment of Functioning scores of 75. Dr. Zafar's assessment is generally consistent with his objective observations and for said reason deserves significant weight. Unlike Nurse Boyd, he is a medical doctor and is an acceptable mental [sic] source.

(Tr. at 15-16).

On August 9, 2006, the Social Security Administration issued Social Security Ruling (SSR) 06-3p, 71 Fed. Reg. 45,593 (Aug. 9, 2006). The ruling clarified how it considers opinions from sources who are not what the agency terms "acceptable medical sources." SSA separates information sources into two main groups: "acceptable medical sources" and "other sources." It then divides "other sources" into two groups: medical sources and non-medical sources. 20 C.F.R. §§ 404.1502, 416.902 (2007). Acceptable medical sources include licensed physicians (medical or osteopathic doctors) and licensed or certified psychologists. 20 C.F.R. § § 404.1513(a), 416.913(a) (2007). According to Social Security regulations, there are three major distinctions between acceptable medical sources and the others:

1.  Only acceptable medical sources can provide evidence to establish the existence of a medically determinable impairment. Id.

2.  Only acceptable medical sources can provide medical opinions. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) (2007).

3.  Only acceptable medical sources can be considered treating sources. 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2007).

In the category of "other sources," again, divided into two subgroups, "medical sources" include nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists. "Non-medical sources" include

40

school teachers and counselors, public and private social welfare agency personnel, rehabilitation counselors, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, clergy, and employers. 20 C.F.R. §§ 404.1513(d), 416.913(d) (2007).

"Information from these 'other sources' cannot establish the existence of a medically determinable impairment," according to SSR 06-3p. Sloan v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007). "Instead, there must be evidence from an 'acceptable medical source' for this purpose. However, information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." Id. quoting SSR 06-3p.

The ALJ properly found that Nurse Boyd is not an acceptable medical source and therefore her opinion is not entitled to the same weight as the opinion of a doctor.

In addition, Ms. Boyd's opinion is clearly not based on any medical records, including her own. She only saw plaintiff twice -- on August 11, 2008, and January 29, 2009.

On August 11, 2008, plaintiff reported that he had been stable, his post-traumatic stress disorder was relatively well-controlled, and he had not used drugs for the past three years. After performing a mental status exam, Ms. Boyd wrote, "Individual is alert and oriented, cooperative. His mood is stable and his affect is bright. He states he can have some mild anxiety. Current issues of being out of work and his health are stressful to him, but he states he's coping effectively. He denies any suicidal or homicidal ideation and denies psychosis, although there is a strong history of psychosis. He denies any other concerns. Average intellectual functioning. Insight and judgment seem fair. Mental status is otherwise unremarkable."

On January 29, 2009, plaintiff reported that "since I saw him last he was incarcerated. He states that he received a possession charge in February of that year. He states he eventually was sent to prison. He states he wasn't honest with me when he met with me last. He states he still had occasionally been using cocaine, but it wasn't as bad as it had been." Plaintiff said he did have a history of psychosis "even absent of substance abuse, but states it did make all of his problems worse." Plaintiff claimed he was irritable on Prozac and Vistaril. "He denies any current substance abuse." Plaintiff was on parole at the time. Under mental status exam, Nurse Boyd recorded plaintiff's reports of his symptoms in addition to noting that he was alert and oriented, cooperative, had average intellectual functioning, fair to good insight and judgment.

On October 20, 2008 -- three months earlier -- plaintiff told a medical professional in the Missouri Department of Corrections that he was doing "quite well" on the combination of Prozac and Vistaril. The only thing that had happened between that appointment and the appointment with Ms. Boyd when he said those medications were not working was that plaintiff decided to apply for disability benefits. Her observations of plaintiff were that he was entirely normal. The only abnormality in either of her records came from plaintiff's own allegations -- and he admitted to her in the second visit that he had lied to her during the first. Additionally, in the second visit when he confessed his cocaine usage over the past year, he said still had "occasionally been using cocaine, but it wasn't as bad as it had been." Just five months earlier, he admitted that he had been using cocaine daily -- which suggests that even on this second visit, plaintiff was not being entirely honest with Ms. Boyd. Therefore, the ALJ properly discounted any opinion based on plaintiff's allegations.

But more disturbing is the fact that Ms. Boyd, on February 16, 2009 -- two weeks after plaintiff told her he had lied about not using drugs for three years and that he had actually used drugs and gone to jail for a drug conviction less than a year earlier -- wrote an opinion for the Missouri Department of Social Services. In that opinion, she stated that plaintiff had been off drugs for three years but still struggled with mental issues. She well knew that was not true, as plaintiff had told her two weeks earlier that it was a lie. She knew plaintiff had not only used drugs during the last year but had been convicted of possession of cocaine and had gone to jail. Her entire opinion in this form is based on plaintiff's allegations, and she knew that he had not been honest with her, plus she either deliberately or recklessly included false material information in paperwork designed to secure government benefits for plaintiff.

Finally, the Medical Assessment form she completed for this disability case indicates that plaintiff had no ability to use judgment; however, her own medical records indicate that

42

she found he had "fair to good" judgment on both of the occasions she saw him. Her records indicate that plaintiff said he was coping effectively with the stresses in his life; however, she found on this form that he had no ability to deal with work stresses. She found that he had a poor memory; however, Dr. Bhalla, Dr. Spencer, and an Emergency Room doctor all found that plaintiff's memory was normal. The only allegation of poor memory was in plaintiff's hearing testimony, not in any medical record. Even his fiancée indicated in a Function Report that plaintiff's impairments do not affect his memory.

It does not appear from these records that Ms. Boyd even believed her opinion was accurate -- her findings are far more significant than any complaint plaintiff ever made to her or any doctor, far more significant than anything she observed or assessed, far more significant than any other medical professional observed or assessed, and far more significant than plaintiff's live-in girl friend described. A medical provider's desire to help his patient secure government benefits is not a reason to give the opinion weight if it is clear the provider has embellished the patient's limitations. The ALJ properly gave no weight to the opinion of Nurse Boyd.

VIII.    CONCLUSIONS

Plaintiff argues only that the ALJ "has found a way to discount all of the medical sources that have completed mental residual functional capacity assessments of plaintiff. Yet the three different providers have very similar conclusions regarding Plaintiff's limitations and there are no reports to the contrary." As mentioned above, the ALJ did not discount the opinion of Dr. Spencer. And the summary of medical records above clearly show the basis for discounting the opinions of Dr. Bhalla and Pascha Boyd, R.N. Additionally, I point out that plaintiff actually testified he could perform a sit-down job where he simply notified someone of trouble if he observed trouble on a monitor. His amended alleged onset date is February 1,

2008 -- allegedly the last time he used illegal drugs or alcohol. However, plaintiff testified on October 28, 2010, that he last used cocaine on August 25, 2008 -- almost seven months after his alleged onset date. He also inconsistently testified April 29, 2009, that he last used cocaine in February 2008. This suggests that plaintiff continued to use illegal drugs and simply lost track of what he had said on earlier occasions. In fact, he told some medical providers he had not used illegal drugs in seven years, he told others he had not used illegal drugs in three years, and it is clear from the record and his admissions that he had continued to use drugs all along. In fact, he admitted in late 2008 that he had been using cocaine daily.

On May 19, 2008, plaintiff told Dr. Zafar, a treating psychiatrist, that there were no mental issues. On August 30, 2010, he told Dr. Bhalla, another treating psychiatrist, that he had no mental issues other than being anxious about his upcoming disability hearing.

Although plaintiff consistently used lack of funds as an excuse for failing to get recommended tests and for his noncompliance with medication treatment, he was able to come up with the money to support a one- to three-pack a day cigarette habit and up to daily use of cocaine and other illegal drugs. He admitted that he was not working because his lack of a driver's license due to felony DWI convictions and his girl friend's day job meant she could not drive him around to look for work. His lack of employment was not the result of any impairment. His daily activities or restrictions were likewise not the result of his impairments, according to his testimony: he stayed in bed all day because he had nothing to do; he did not watch much television because he was only interested in football which he did watch; he does not get out of the house much because he does not have a driver's license and his girl friend is at work during the day; he likes to mess with cars but no longer does that because he does not have a car to mess with. The evidence of record overwhelmingly supports the ALJ's findings.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
February 11, 2013